## A05A1801. ABERNATHY v. THE STATE.

(630 SE2d 421)

ADAMS, Judge.

Michael Abernathy appeals after a jury convicted him of four counts of aggravated child molestation, one count of incest, five counts of child molestation and twelve counts of misdemeanor sexual exploitation of children. For the reasons set forth below, we reverse Abernathy's convictions on ten of the twelve counts of sexual exploitation and affirm his convictions on the remaining charges.

"On appeal the evidence must be viewed in the light most favorable to support the verdict, and appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." (Punctuation and footnote omitted.) *Williams v. State*, 277 Ga. App. 106 (1) (625 SE2d 509) (2005).

Viewed in that light, the evidence shows that in 1998, 12-year-old J. I. moved with his mother, Lori Abernathy, and his older sister, A. I., to live with Michael Abernathy, his new stepfather. One day in late December 1999, a few days before J. I.'s thirteenth birthday, Lori began wrestling with J. I. in the living room. Abernathy, who was watching, told them that the winner of the match would be the one who was able to get the other person's clothes off first. After J. I. removed his mother's clothes and she removed his, they wrestled naked while Abernathy watched. J. I. saw his sister, A. I., come into the room, and then quickly go back into her own room.

A few days later, on New Year's Day, 2000, after J. I. turned 13, Abernathy showed him pictures of naked children and adults on the computer and tried to get J. I. to talk to women in internet chat rooms about sex. A couple of nights later, Abernathy and J. I. were again on the computer when Abernathy began talking in a computer chat room to a man who was describing having sex with his own mother. Lori was in the room at the time.

Lori left to take A. I. to work, and when she returned Abernathy told Lori and J. I. to go into the living room and lie down on the floor. Abernathy began touching Lori's breasts with his mouth and hands and instructed J. I. to do the same. Abernathy also placed J. I.'s finger in Lori's vagina. Abernathy then began performing oral sex on Lori and told J. I. to perform oral sex on his mother. With Lori's encouragement, J. I. put his mouth on Lori's vagina. When the telephone rang, J. I. left the other two and went into his bedroom.

Three or four months later, in the spring of 2000, J. I. was lying on the sofa in the living room watching television, and Abernathy and Lori were sitting together. After conferring with Abernathy, Lori came over to the couch and started touching J. I.'s penis. She instructed him to put his hands on her breasts. Abernathy then

suggested that they put some pillows on the living room floor. Lori invited J. I. to lie on the floor with her and she removed his jogging pants. She then removed her own clothing. Lori began touching J. I.'s penis, while Abernathy touched Lori's breasts and vagina with his hands and his mouth, instructing J. I. to do likewise. Abernathy told J. I. to put his mouth on Lori's vagina, which he did. He then told Lori to give J. I. a "treat" because he had given her one. In response, Lori performed oral sex on J. I.

Abernathy then suggested that J. I. have sexual intercourse with his mother, but J. I. demurred. Lori got up and went into the bedroom saying her back was hurting, and J. I. followed. Abernathy again suggested that J. I. have sex with his mother to make her "feel better." J. I. asked Lori if she wanted him to, and she replied that she did. Lori began kissing J. I. and touching his penis to get him aroused. At Abernathy's direction, J. I. stuck his penis in Lori's vagina and moved up and down on top of her. Afterward, Abernathy had anal sex with Lori, and suggested that J. I. do the same. With Lori's encouragement, J. I. began to have anal intercourse with her. When he was unable to continue, Abernathy came up behind J. I. and placed his hands and mouth on J. I.'s penis in an attempt to arouse him. J. I. "jerked away from him real quick" and went into his own bedroom.

A. I. testified at trial to a similar transaction involving Abernathy. One night in the summer of 1999, A. I. asked Lori to sleep with her because she was afraid of a mouse they had seen earlier. Abernathy announced that he was going to sleep with them also. A. I. was asleep when Abernathy put his hand in her underwear and put his fingers inside her vagina. She tried to push him off, and when he would not stop, she turned toward the wall where he could not reach her. He then left. A. I. told her mother what had happened, but her mother took no action and the matter was dropped.

In addition, A. I. testified that sometimes when she was using the computer, Abernathy would come in after everyone else was asleep and ask her to visit sexual chat rooms with him. On another occasion, when Lori and J. I. were out, Abernathy tried to show A. I. a magazine with pictures of naked women. She told him that she had to go to work. When she was in the bathroom getting ready for work, Abernathy came into the room, with his penis showing and asked her what she thought about it. She just turned and went out of the bathroom. A. I. needed to take a shower, but she was afraid that Abernathy would come in because the bathroom lock was broken. She turned the shower on before getting undressed and waited. Shortly thereafter, Abernathy came into the bathroom. When he saw her standing there dressed, he gave her a hug and told her not to tell her mother anything that happened.

A. I. also testified that she had walked into the living room around New Year's Eve of 1999 and saw Lori and J. I. on the floor "wrestling with no clothes on at all . . . and Michael Abernathy was telling them what to do . . . you know, how to . . . wrestle." She said that she turned around and went back into her bedroom. Later she saw Abernathy showing J. I. a picture of a naked teenage girl on the computer. A. I. moved out of the house a few months later in April 2000.

By 2001, Abernathy and Lori began to experience marital problems. At one point, they argued over a period of three days and discussed divorce. One night the arguments were so bad that J. I. did not get any sleep. The next day Lori called her sister, Melody Brown, and told her that something had happened between Abernathy, J. I. and her and that Melody would hate her for it. She then put J. I. on the phone and he began to tell his aunt what had happened. J. I. told her that Abernathy had made him touch and kiss Lori's breasts and put his fingers in Lori's vagina. Brown told J. I. that she had heard enough. She told him to pack his things and said that she was coming to get him. Brown took J. I. to her home in Walker County, and Lori came to her house several days later. Brown testified that the night Lori arrived she admitted that there had been some inappropriate touching between J. I., Abernathy and her, and the next day she checked herself into a psychiatric hospital.

That night, J. I. told Brown what had occurred, stating that it had started with Abernathy showing him pornography on the internet, with his mother watching. J. I. also recounted the incidents of sexual intercourse in more detail to his aunt, telling them, inter alia, that Abernathy had touched J. I.'s penis with his hand and mouth to get him aroused so J. I. could have sex with Lori.

That same night, Brown spoke with Abernathy, who stated that he was sorry for what he had done to A. I. and J. I. and that he thought his actions may have been due to some things that had happened to him in his past and that he was going to get help.

When Lori checked herself into the psychiatric hospital, she left her belongings with Brown. Among these items was a cardboard box of computer disks, which Brown turned over to police. Chief Assistant District Attorney Lee Darragh testified that he took the box of computer disks to a technology service and had them consolidated for easy reference. He then reviewed and labeled each of the images and identified a number of photographs taken from the disks. These images, which contained sexually explicit subject matter, were introduced in connection with the 12 counts of misdemeanor sexual exploitation of children.

J. I. later talked to police about the incidents involving his mother and Abernathy. During a meeting with Sergeant Mason

Brewer of the Walker County Sheriff's Office, J. I. identified on anatomical drawings the "places that I touched Michael or that Michael had touched me and places that I had touched my mom and places my mom had touched me." J. I. identified these drawings at trial and they were admitted into evidence. A videotape of Sergeant Brewer's interview with J. I. was played for the jury.

Abernathy and Lori were tried separately on these charges. Lori did not testify at Abernathy's trial, but Abernathy testified that A. I. and J. I. were very unhappy living at his house in Hall County away from their friends. Abernathy recounted an incident in which he inadvertently discovered J. I. having a sexually explicit conversation in an internet chat room. He told J. I. never to do that again. Abernathy denied owning or downloading any pornographic pictures onto the computer disks introduced into evidence and also denied taking part in any of the sexual activities described by A. I. and J. I. Abernathy further testified that he was recovering from a broken foot at the time the incidents were supposed to have occurred and thus he could not have taken part in them.

1. Abernathy asserts that the evidence was insufficient to support his convictions on the 12 counts (Counts 11-22) of sexual exploitation of children. He contends that the state failed to prove that the individuals pictured in the photographs at issue were minors or that he had knowledge that they were minors. He also asserts that the state failed to prove that the photographs were of human beings and not computer-generated images.

Abernathy was indicted for violating OCGA § 16-12-100 (b) (8), which provides that "[i]t is unlawful for any person knowingly to possess or control any material which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct." A minor is defined under the statute as anyone under the age of 18 years. OCGA § 16-12-100 (a) (1). It is axiomatic that the state bore the burden of establishing each element of this crime, and thus the state was required to prove that the persons depicted in the photographs were under 18 years of age.

To establish these offenses, the state introduced, without objection, a series of photographs taken from the computer files left at Brown's house. The only testimony regarding these pictures was limited to chain of custody and identification evidence. In addition, the state put into evidence the handwritten notes of the assistant district attorney who first viewed these photographs for the state, listing the file name for each picture as well as the attorney's own handwritten description of each photograph. Abernathy contends that this evidence was insufficient to prove the elements of the offense.

The issue before us is whether a lay jury may be entrusted with determining the ages of the persons depicted in the computer photographs or whether the state was required to present additional evidence, such as expert testimony, to establish this fact. In one Georgia case involving a charge of sexual exploitation of children, the Supreme Court of Georgia upheld the defendant's conviction where the state had presented expert testimony that the persons depicted in the photographs were under the age of 18 years. *Tennille v. State*, 279 Ga. 884, 885 (2) (622 SE2d 346) (2005). Other courts addressing this issue have acknowledged that in some instances involving postpubescent teenagers, expert testimony may be required to establish that the subjects of the photographs are minors. *United States v. Riccardi*, 405 F3d 852, 870 (3) (10th Cir. 2005). On the other hand, where the individual in the photograph is a prepubescent child who is unquestionably under 18 years of age, no expert testimony is necessary. *United States v. Katz*, 178 F3d 368, 373 (5th Cir. 1999). Accordingly, this determination must be made on a "case by case basis." Id.

Upon reviewing the record in this case, we find that, excepting the images at issue in Counts 13 and 14, the state failed to carry its burden of proving that the photographs in this case depicted minor children. The individuals in those pictures are either not fully visible or are so mature that something beyond mere chain of custody evidence was required to establish that they were younger than 18 years.[1] Accordingly, because the state failed to prove this necessary element of the crime of sexual exploitation of children under Counts 11, 12, 15, 16, 17, 18, 19, 20, 21 and 22, we reverse Abernathy's convictions on those counts.

With regard to the remaining Counts 13 and 14, we find that there was sufficient evidence to support the jury's conclusion that Abernathy knowingly possessed these images. Both knowledge and possession "may be proved, like any other fact, by circumstantial evidence." (Citation omitted.) *Thurman v. State*, 249 Ga. App. 390, 392 (2) (b) (547 SE2d 715) (2001). See also *Heller v. State*, 275 Ga. App. 637, 638 (1) (621 SE2d 591) (2005). J. I. identified the disks and the container holding them as being from Abernathy's house. Some of these disks were kept by the computer, and J. I. testified that a number of the graphic pictures Abernathy showed him came from these disks and others came from a bag Abernathy kept. J. I. explained that Abernathy would take a disk from the tray by the computer and put it in the disk drive to display the images. He

---

[1] We note that even the district attorney's notes describe the photograph at issue in Count 19 as depicting "teen f(emale)s – or young adults."

identified a number of the pictures taken from the disks as pictures Abernathy and Lori had shown him, including the pictures at issue in Counts 12, 14 and 21. The testimony of A. I. and J. I. also established that Abernathy had the ability to access sexually oriented photographs and chat rooms on the internet. In addition, Brown testified that she had seen Abernathy use the computer to obtain a sexually explicit photograph which she identified in court as one of the photographs taken from the computer disks Lori gave her.

Thus, the evidence was sufficient for the jury to conclude that Abernathy possessed the computer disks, and even if the jury found that he possessed them jointly with Lori, such possession was sufficient to sustain his conviction. See generally *Price v. State*, 240 Ga. App. 37, 39 (522 SE2d 543) (1999) ("The law recognizes that possession may be sole or joint."). The evidence was also sufficient to establish that Abernathy's possession was knowing as we have held that in the two photographs at issue in Counts 13 and 14, the fact of the subjects' minority was evident without the necessity of expert testimony or other evidence.

Moreover, from our examination of these documents, we find no merit to Abernathy's argument that the state failed to authenticate the photographs by establishing that the pictures depicted humans and not computer-generated models. The pictures themselves appear to depict actual children, and Abernathy asserts nothing more than mere speculation that the images could have been computer-generated. See *United States v. Vig*, 167 F3d 443, 449-450 (C) (8th Cir. 1999); *People v. Normand*, 215 Ill.2d 539, 549-554 (831 NE2d 587) (2005).

Accordingly, Abernathy's convictions under Counts 13 and 14 of the indictment are affirmed.

2. Abernathy also asserts that the state failed to carry its burden as to the charges of aggravated child molestation, child molestation and incest. His primary argument appears to be that because there were inconsistencies and conflicts in the evidence, the state failed to carry its burden of proof. But it is for the jury, not the appellate court, to resolve conflicts in testimony, weigh the evidence and draw reasonable inferences therefrom. *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Based upon our review, we find that the record contains sufficient evidence to support Abernathy's convictions on Counts 1 through 10 of the indictment. See *Wyatt v.*

*State*, 243 Ga. App. 882 (4) (534 SE2d 431) (2000); *Graham v. State*, 239 Ga. App. 429, 434 (6) (521 SE2d 249) (1999); OCGA §§ 16-6-4 (a), (c); 16-6-22 (a) (2).

3. Abernathy further contends that the trial court erred in denying his motion for new trial because he asserts that he received ineffective assistance of counsel at trial. In order to prove this claim, Abernathy must establish both that his counsel's representation was inadequate and that this prejudiced the outcome of his trial:

> The two-prong test for determining the validity of a claim of ineffective assistance of counsel provided in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984) asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different, but for counsel's deficiency.

(Footnote omitted.) *Whitaker v. State*, 276 Ga. App. 226 (1) (622 SE2d 916) (2005). Moreover, "[a] trial court's finding that a defendant has not been denied effective assistance of trial counsel will be affirmed unless clearly erroneous." (Punctuation and footnote omitted.) *Ford v. State*, 274 Ga. App. 695, 702 (5) (a) (617 SE2d 262) (2005).

(a) Abernathy first contends that his trial counsel provided ineffective assistance of counsel by representing both Lori and him in their separate criminal trials. He contends that his trial attorneys were operating under an actual, nonwaiveable conflict of interest which affected the representation afforded him at trial.

Abernathy and his wife, Lori, were jointly indicted on the charges in this case on September 6, 2001, and they first met with their trial attorney, Daniel Summer, at some point prior to September 27, 2001. Summer told the Abernathys in that first meeting that it was not a good idea for him to represent them both "because joint representation is fraught with potential for conflict." He recalled that they were "insistent" that he represent them both. Around this same time, the Abernathys also met with another attorney who declined to assume their joint representation because of the potential for conflict.

The Abernathys retained Summer as their trial counsel, and he testified that over the course of his representation, he had numerous conversations with both of them about the benefits of having separate counsel. He told them that

> it was best to have separate counsel because one may have a defense not available to the other, there may be inconsistent defenses, one of the parties may be offered a plea

bargain in exchange for testimony against the other, that all of those things were possibilities that obviously if I undertook joint representation would not be able to exploit that.

He recalled that they remained "adamant" that he represent them both because they wanted to present a joint defense to the charges. Their defense was that the charges were false. They contended both A. I. and J. I. were unhappy in Hall County and that J. I. had fabricated the allegations because he did not like Abernathy and wanted to move to Tennessee to live with his biological father. Both Abernathy and Lori consistently and adamantly denied to Summer that any of the incidents alleged in the indictment had occurred.

After Summer advised the prosecution that he would be representing both defendants, the state, with Summer's agreement, filed a Motion for Hearing to Determine Existence of Conflict in Joint Representation of Defendants on January 24, 2002. The trial court held a hearing on the motion on February 6, 2002. At the hearing, Summer advised the court that it was his normal practice to represent just one defendant in a multi-defendant indictment, but he felt that, given how the indictment was drawn, he could represent both defendants without conflict. Summer stated that he had discussed the matter with both Abernathys and that they wanted him to represent them both. The trial court then questioned each of the Abernathys individually advising them of potential scenarios for conflict, in particular, noting that their attorney's ability to negotiate individual plea bargains would be hampered. The court asked Abernathy if he understood his attorney's statements regarding the potential for conflict, to which Abernathy replied that he did. The court also asked Abernathy that even in the light of potential conflicts, whether he was "still insistent" that Summer represent him. Abernathy replied, "Yes sir, I am. We talked about it, as Mr. Summer said, when we first talked to him. He advised us of that. And we at that time talked about it extensively. And we do stand unified, and both of us do want Mr. Summer as our attorney." Lori echoed this position.

Summer then advised the court that after reviewing the discovery provided by the state, he did not see any conflict at that time. But if a conflict arose, he stated that he would advise both Abernathys immediately and bring it to the court's attention. He stated that he had been instructed by both parties not to enter into any plea negotiations because they maintained their innocence and wished to present a unified defense. He also stated that he had discussed the issue of a conflict with them on approximately four to five occasions, and both of them remained adamant that they wanted him to represent both of them.

The trial court and Summer then discussed the issue of further potential conflicts and asked the Abernathys if they understood that these conflicts could arise. They both replied that they understood. At the hearing's conclusion, the trial court denied the state's motion. Relying upon Summer's statement in his place that he saw no conflict at that time, the court found that no antagonistic defenses existed. The court again confirmed that it was the Abernathys' decision to go forward with one counsel. But the court decided to appoint attorney Elizabeth Reisman as a standby counsel to step in and represent one of the defendants in the event a conflict arose. He instructed the attorneys to determine which of the two defendants Reisman would represent along with Summer, and let him know by letter. Abernathy indicated that he understood this arrangement. No such letter was filed with the court, but later Reisman filed an entry of appearance and one pretrial motion on behalf of both defendants. The parties also agreed to sever the trials of the two defendants.

Several months later, on October 10, 2002, shortly before jury selection began in Abernathy's trial, the trial court revisited the issue of the joint representation. Summer represented to the trial court that he had again spoken with his clients about the potential for a conflict of interest, and they reiterated that they wanted him to represent them both. He stated that "nothing has changed in terms of inconsistency, lack of inconsistency or anything like that, it's simply that they deny the allegations and that's the defense." The prosecutor noted two potential conflicts in that Abernathy's uncle had suggested that Lori's family was manufacturing the charges in an attempt to get Abernathy's house. In addition, the assistant district attorney noted that she had made Lori an offer of a reduced sentence in exchange for her testimony against Abernathy. The record indicated that Summer had discussed the plea with Lori, and that Reisman planned to speak to her about it as well. Both Abernathy and Lori were present at the hearing. The trial court asked both Abernathy and Lori whether, after hearing these facts, they understood the potential for conflict and whether they still wanted Summer for an attorney. They both replied that they did.

Abernathy argues that there was a conflict of interest based upon statements Lori made prior to trial to police, her sister, Melody Brown, and in a journal she kept in connection with her psychological treatment. He asserts that a conflict existed due to admissions he asserts that Lori made in her videotaped interview with the Hall County Sheriff's Office. He contends that these statements created antagonistic defenses between Abernathy and Lori, and that due to this conflict Summer could not put Lori on the stand at Abernathy's trial. Abernathy asserts that the offer of a plea agreement to Lori created a conflict of interest. He also states that the appointment of

Reisman only exacerbated the situation because she entered an appearance on behalf of both defendants. He also asserts that the joint representation prevented him from asserting the defense that Lori, not he, committed the crimes charged, or that he was less culpable for the crimes than she was. And at the hearing on the motion for new trial, Abernathy presented expert testimony of a law professor who opined that this situation presented an actual, non-waiveable conflict of interest under state ethics rules, which affected the representation given to Abernathy.

"Single representation of multiple defendants raises no per se presumption of conflict of interest or prejudice." (Citation and punctuation omitted.) *Curry v. State*, 238 Ga. App. 511, 518 (519 SE2d 269) (1999). But "[t]here is a presumptive conflict of interest when one attorney is required to represent multiple defendants over their objection." *Jackson v. State*, 259 Ga. App. 566, 569 (2) (578 SE2d 181) (2003). Abernathy, however, is not entitled to the benefit of this presumption because he did not object to the joint representation until after trial. Id. Rather, to establish ineffective assistance of counsel, Abernathy must demonstrate an actual conflict of interest that impaired his trial counsel's performance:

> In order to establish a constitutional violation of right to effective assistance of counsel in a noncapital case[2] . . . a defendant who raised no objection at trial (as is true in this case) must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. Until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.

(Punctuation omitted.) *Barnes v. State*, 160 Ga. App. 232 (286 SE2d 519) (1981). See also *Cuyler v. Sullivan*, 446 U. S. 335, 347 (100 SC 1708, 64 LE2d 333) (1980).

Abernathy must show a substantial factual basis to support his claim of an actual conflict of interest; merely a theoretical or speculative conflict is not enough. *Barnes v. State*, 160 Ga. App. at 233; *Wright v. State*, 158 Ga. App. 494 (280 SE2d 896) (1981). The "mere possibility of conflict is insufficient to impugn a criminal conviction amply supported by competent evidence." *Capers v. State*, 220 Ga. App. 869, 874 (2) (470 SE2d 887) (1996).

In addition, Abernathy is required to show "an actual lapse in representation" on the part of his trial attorney. *Woods v. State*, 275

---

[2] *Fleming v. State*, 246 Ga. 90 (270 SE2d 185) (1980).

Ga. 844 (573 SE2d 394) (2002). "The test is whether the representation deprived either defendant of the undivided loyalty of counsel. In other words, did counsel slight one defendant to favor the other?" *Jackson v. State*, 259 Ga. App. at 569 (2). See also *Barnes v. State*, 160 Ga. App. at 233.

Moreover, in cases such as this one "[w]here defendants state on the record that they have discussed the case with counsel, that there is no conflict of interest and that they are satisfied to proceed with one counsel," this Court has held that any error was induced by the defendants' own statements, and thus no reversal is warranted. *Miller v. State*, 271 Ga. App. 524, 525 (2) (610 SE2d 156) (2005). See also *Brumelow v. State*, 239 Ga. App. 119, 123 (6) (520 SE2d 776) (1999) (" 'A party can not during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later.' ").

Abernathy, however, seeks to circumvent the waivers he made on the record with regard to his joint representation by asserting that the conflict in this case was nonwaiveable, citing Rule 1.7 (c) of the Georgia Rules of Professional Conduct. But the United States Supreme Court has cautioned that ethical standards are merely guides to an attorney's conduct. "Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside*, 475 U. S. 157, 165 (106 SC 988, 89 LE2d 123) (1986).

Applying these principles to the instant case, we find that Abernathy has failed to establish an actual conflict of interest that adversely affected his trial counsel's performance. Both Abernathy and Lori consistently denied that the incidents charged in the case ever happened. They chose to pursue a unified defense, albeit in separate trials. And they persisted in this strategy despite repeated cautions by their counsel and the court that by utilizing the same attorney, they gave up the opportunity to explore other strategies and defenses that may have been available to them.

Moreover, we find that Lori's pretrial statements did not create an actual conflict of interest. Contrary to Abernathy's assertions on appeal, Lori did not confess to the crimes charged in the indictment in her videotaped statement to police. Rather, Lori told police that after taking a sex education class at school, J. I. had, on two occasions and on his own initiative, touched her breasts in an inappropriate, and what she termed "exploratory," fashion. But she stated (1) that these incidents occurred after A. I. had moved out of the house and thus after at least some of the incidents alleged in the indictment; (2) that she immediately removed herself from the situation and told J. I. his actions were inappropriate; and (3) that Abernathy was not involved in these incidents at all. Lori consistently denied that the

incidents that form the basis for the indictment ever occurred. Nor do we find any inherent conflict in Lori's other pretrial statements. Moreover, Summer testified that he discussed the contents of Lori's videotaped statement with Abernathy, and that Abernathy chose to pursue joint representation.

Although Abernathy asserts that this supposed conflict of interest prevented Summer from calling Lori as a witness in Abernathy's trial, the record shows that this decision was not based upon any perceived conflict of interest, but rather was due to Summer's conclusion after viewing her videotaped police interview that Lori would not make a good witness. Indeed, Lori did not testify at her own trial, although Abernathy testified in his own defense.

Nor did the issue of Lori's plea bargain offer create an actual conflict of interest that hampered Summer's representation of Abernathy. The record shows that the parties had agreed in advance not to pursue any such offers, and Lori, in fact, rejected the state's offer. Moreover, the trial court made sure that both Abernathy and Lori were aware of this issue and its ramifications at the time of the October 2 conflict hearing, yet they both chose to retain Summer as their counsel. Further, we find no support for Abernathy's argument that the trial court's appointment of Reisman as counsel created a conflict of interest.

Thus, Abernathy has failed to show a substantial basis in fact to support his claim of an actual conflict of interest that adversely affected his counsel's representation. "The record in this case clearly shows that there was no genuine inconsistency between the defenses of appellant and his wife. Counsel was free to investigate and present a defense for each of his clients without damaging the defense of the other and the record shows that he vigorously did so." (Citations omitted.) *Ward v. State*, 195 Ga. App. 166, 167 (1) (393 SE2d 21) (1990). See also *Jackson v. State*, 259 Ga. App. at 569 (2); *Avans v. State*, 207 Ga. App. 329, 331 (4) (427 SE2d 826) (1993).

Even assuming arguendo that a conflict existed, any error was induced by Abernathy through his repeated insistence that Summer represent both him and his wife. Thus, any such error cannot serve as the basis for reversal of his convictions on appeal. *Christopher v. State*, 262 Ga. App. 257, 263 (3) (585 SE2d 107) (2003); *Miller v. State*, 271 Ga. App. at 525 (2); *Brumelow v. State*, 239 Ga. App. at 123 (6).

(b) Abernathy also takes issue with the way in which Summer conducted his defense, raising numerous grounds that he asserts support his claim of ineffective assistance of counsel. But to establish ineffective assistance of counsel, Abernathy first must overcome the strong presumption that his trial attorney's performance fell within the range of reasonable professional conduct:

The decisions on which witnesses to call, whether and how to conduct cross-examination, which jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of counsel after consultation with the client. Trial counsel's strategic decisions made after thorough investigation are virtually unchallengeable. They provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them.

(Citation omitted.) *Botelho v. State*, 268 Ga. App. 129, 132 (3) (601 SE2d 494) (2004). Moreover, "[t]he standard regarding ineffective assistance of counsel is 'not errorless counsel and not counsel judged ineffective by hindsight, but counsel . . . rendering reasonably effective assistance.' " (Citation and punctuation omitted.) *Jackson v. State*, 276 Ga. 94, 96 (6) (575 SE2d 447) (2003).

(i) Abernathy first contends that an answer elicited in his trial counsel's cross-examination of J. I.'s father improperly bolstered the boy's testimony. Summer asked the father, "As a matter of fact, you don't know whether any of this [regarding the molestation of J. I.] is true or not?" To which the father replied, "Yes, sir, according to my son. I believe him 100%." This exchange followed a line of questioning in which counsel was attempting to impeach the father with a false statement the father made in connection with a custody hearing. Summer testified at the hearing on the motion for new trial that the question to which Abernathy objects was an attempt to further impeach the father by showing that he would believe anything J. I. had to say despite evidence to the contrary. It is well settled that "such matters as the examination of witnesses are grounded in matters of trial tactics and strategy and do not provide a basis for finding counsel lacking. Such tactical decisions do not equate with ineffective assistance of counsel." (Citation and punctuation omitted.) *Turner v. State*, 245 Ga. App. 294, 296 (4) (c) (536 SE2d 814) (2000). Accordingly, this argument provides no basis for a finding that Summer rendered ineffective assistance of counsel.

(ii) Abernathy's next contention is that trial counsel was ineffective in failing to object to the admission of the anatomical drawings J. I. prepared in connection with his interview with Sergeant Brewer. On each drawing, J. I. indicated the person doing the touching and the object of the touching, and on some of the charts he indicated the names of body parts. Abernathy argues that this writing constituted testimony and that Summer should have objected to their admission into evidence as a violation of the continuing witness rule. But this Court has held that it is not error to allow anatomical charts to go out with the jury because such drawings "have no testimonial value in

themselves but are merely tools to explain testimony given at trial."
(Citation omitted.) *Edwards v. State*, 253 Ga. App. 479, 482 (3) (559
SE2d 506) (2002). See also *Gabbard v. State*, 233 Ga. App. 122, 124 (3)
(503 SE2d 347) (1998). The fact that these documents contain J. I.'s
handwriting does not change this analysis. The identification as to
whose touching he was describing in each chart was necessary to
distinguish them from one another and the other writing was merely
illustrative of his testimony. See *James v. State*, 270 Ga. 675, 678 (7)
(513 SE2d 207) (1999). This argument has no merit.

(iii) Abernathy further argues that his trial counsel was ineffec-
tive in failing to introduce evidence that Lori had been acquitted in
her trial on the four counts of aggravated child molestation. Summer
testified that because the state was arguing that these incidents were
part of a repeated pattern of sexual misconduct on the part of
Abernathy and Lori, he made the strategic decision not to introduce
this evidence because he did not want the jury to know that she was
acquitted on some counts and convicted on others. Such a strategic
decision does not provide a basis for finding that trial counsel was
ineffective. And even though evidence of Lori's acquittal was admis-
sible as some evidence that Abernathy did not aid, abet or encourage
the crimes charged, "it does not preclude [Abernathy] from being
indicted, tried, convicted or punished for commission of the crime."
(Citation omitted.) *State v. Roberts*, 234 Ga. App. 522, 523 (1) (507
SE2d 194) (1998). Thus, Abernathy cannot establish that trial coun-
sel's failure to introduce such evidence prejudiced his defense.

(iv) Although Abernathy next asserts ineffectiveness in his trial
counsel's failure to file a special demurrer to the indictment, we find
no basis for reversal. "The purpose of an indictment is to allow the
defendant to prepare his defense intelligently and to protect him from
double jeopardy." *Dowdell v. State*, 278 Ga. App. 142, 144 (2) (628
SE2d 226) (2006). Even assuming, without deciding, that trial coun-
sel was ineffective in failing to file a demurrer in this case, Abernathy
has failed to establish that his defense was prejudiced by any alleged
inadequacy in the indictment.

(v) Abernathy asserts that his trial attorney was ineffective in
failing to present evidence of his good character. Summer testified
that he made the strategic decision not to put up character evidence
because he was concerned that the state would cross-examine Aber-
nathy on certain matters that could prove prejudicial. "Trial tactics
and strategy, however mistaken they may appear with hindsight, are
almost never adequate grounds for finding trial counsel ineffective
unless they are so patently unreasonable that no competent attorney
would have chosen them." (Citation omitted.) *Terrell v. State*, 276 Ga.
App. 102, 104 (2) (622 SE2d 434) (2005). Additionally, this Court has

held that the decision not to present character evidence will not form a basis for a finding of ineffective assistance of counsel. Id.

(vi) The next asserted error is trial counsel's failure to object on the ground that the state did not lay a foundation under OCGA § 24-4-48 for the introduction of the computer photographs into evidence. That statute addresses the authentication of photographic evidence to establish that the photographs "show reliably the fact or facts for which the items are offered." OCGA § 24-4-48 (b). And the statute makes clear that it is not the exclusive method for the introduction of photographic evidence. OCGA § 24-4-48 (d).

The photographs in question were taken from the computer disks Brown provided police. They were introduced not to show that they accurately represented the sexual events depicted, but rather to show that Abernathy possessed sexually explicit photographs in violation of the statute outlawing sexual exploitation of children. Moreover, a number of these photographs were identified by J. I. as being photographs shown to him by Abernathy and Lori. J. I. also identified the container and disks from which the photographs were taken as being the disks Abernathy kept by the computer and used to display sexually explicit photographs to him. Other witnesses testified that the photographs in evidence were taken from these disks. A. I. also testified that she observed Abernathy displaying sexually explicit photographs to J. I., and Brown identified one photograph as the one Abernathy had displayed for her on the computer. We find that the photographs were sufficiently connected to the testimony and the crimes charged and they were properly admitted into evidence. *Simpson v. State*, 271 Ga. 772, 774 (1) (523 SE2d 320) (1999). "The failure to make a meritless objection cannot be evidence of ineffective assistance of counsel." (Citation omitted.) *Maxey v. State*, 272 Ga. App. 800, 803 (2) (613 SE2d 236) (2005).

(vii) Abernathy also asserts that his trial counsel should have objected to the introduction of the district attorney's handwritten notations describing these photographs because the notes violated the continuing witness rule and represented improper opinion testimony as to the age of the individuals depicted in those photographs. These notations were introduced in connection with the photographs at issue in the counts alleging sexual exploitation of children. We have already reversed ten of the twelve counts, and thus the issue of whether a reasonable probability exists that the outcome of the proceedings would have been different if Summer had objected is moot as to those counts. We also have held that the fact that the photographs for the remaining counts depicted underage children is evident from the photographs themselves. Thus, we find that Abernathy has failed to establish that his defense was prejudiced by his attorney's failure to object to these notes.

(viii) Abernathy next argues that his trial counsel was ineffective in failing to present expert testimony on the proper method for interviewing child molestation victims, on the issue of whether the photographs had been altered and on the issue of whether the children depicted in the photographs were underage. He also asserts error in the failure to call his daughter and his doctor who he claims could have presented exculpatory testimony. For the reasons noted in Divisions 1 and 3 (b) (vii) above, we find that Abernathy has failed to establish that his defense was prejudiced by the failure to call an expert witness as to the age of the children or condition of the photographs. But in any event, Abernathy failed to present any proffer as to what the testimony of these expert witnesses or the doctor would have been. Accordingly, he failed to show that their testimony would have been favorable and would have created a reasonable probability that the outcome of his trial would have been different. *Stevenson v. State*, 272 Ga. App. 335, 341-342 (3) (c) (612 SE2d 521) (2005). And although his daughter testified at the hearing on the motion for new trial, we have reviewed the testimony, and conclude that Abernathy has failed to establish how her testimony created a reasonable probability that the outcome of his trial would have been different.

(ix) Abernathy further contends that Summer was ineffective in failing to request certain jury charges. Although he lists the charges that he asserts should have been requested, he has failed to show whether these charges were authorized by the evidence. But even if we assume that the charges were so authorized, we find that the jury charge was proper as given, and Abernathy has failed to establish that the failure to request the charges prejudiced his defense so as to equate with ineffective assistance of counsel.

(x) In addition, Abernathy asserts that his trial attorney should have required the state to establish venue as to each and every piece of evidence beyond a reasonable doubt. He asserts that the state failed to show that he possessed the photographs and computer disks in Hall County. While venue is an essential element in proving that a defendant is guilty of a crime,[3] Abernathy has failed to show that the state was required to establish venue as to each piece of evidence it introduced at trial. Because we find that the evidence was sufficient to establish venue as to each of the charges in this case, this argument is without merit.

(xi) Abernathy also asserts ineffective assistance of counsel because his attorney failed to call Lori as a witness. But as noted above, Summer explained that his decision not to put her on the stand

---

[3] *Jones v. State*, 272 Ga. 900, 901-902 (2) (537 SE2d 80) (2000).

was based upon his assessment that she would not make a good witness. Thus, this decision was one of trial strategy and cannot form the basis for a finding that Summer provided ineffective assistance of counsel.

(xii) Abernathy additionally contends that his trial attorney should have filed certain pretrial motions, that he was ineffective in cross-examining the police investigators and in perfecting the record. But because he has failed to show any prejudice to his defense resulting from these alleged errors, we find no ground for reversal.

4. Abernathy next asserts that attorney Reisman rendered him ineffective assistance of counsel because she abandoned him by failing to attend or represent him at trial. We find no merit to this argument. Reisman was appointed by the trial court on its own motion, not at the request of either defendant. Her appointment was for the limited purpose of acting as standby counsel in case a conflict arose. Abernathy indicated in open court that he understood the purpose of Reisman's appointment. Reisman testified that she entered an entry of appearance on behalf of both defendants so that she would receive court notices in their cases. She stated that no conflict of interest was brought to her attention during the course of her representation. Moreover, she sat through Lori's trial and discerned no conflict of interest arising from the evidence in that case. And at no time did Abernathy indicate that he wanted Reisman to take a more active role in his case.

We conclude that Reisman's failure to appear at Abernathy's trial was reasonable given the limited purposes for which she was appointed. Moreover, we find that Abernathy has failed to show how Reisman's failure to appear on his behalf prejudiced his defense so as to establish a reasonable likelihood that the outcome of his case would have been different.

5. Abernathy argues that the trial court erred in denying his *Batson* challenge during jury selection.

> An evaluation of a *Batson* challenge involves three steps: (1) the party challenging a peremptory strike must make a prima facie showing of racial discrimination; (2) the party that struck the juror must then provide a race-neutral explanation for the strike; and (3) the court must then decide if the party challenging the strike has proven discriminatory intent.

(Citations omitted.) *McCastle v. State*, 276 Ga. App. 218, 219 (1) (622 SE2d 896) (2005). Moreover, "[o]n appeal, a trial court's findings are entitled to great deference and will be affirmed unless clearly erroneous." (Citation omitted.) Id.

The jury panel in Abernathy's case originally included one male and three female African-American jurors. The African-American man and one of the women failed to appear for the next day of trial, and one of the other women was excused by mutual agreement of counsel due to a scheduling conflict. The absent jurors were never subjected to voir dire. The state struck the remaining African-American woman on the panel, Juror No. 117, Carlinda McAfee.

The prosecutor asserted that she struck Juror McAfee because the juror acted annoyed to be in court, she gave short and curt responses to questions, she seemed reluctant to answer questions and she responded in an unusual way to a question that revealed that the juror's teenage children did not live with her. Her demeanor in responding to voir dire was noticed separately by all three individuals representing the prosecution. The juror was then called back into the courtroom for further voir dire. Under questioning, Juror McAfee revealed that she had two teenage children who did not live with her. One of them had moved out because he would not "obey [the juror's] rules and he felt like he could do whatever he wanted to." Because the state was aware that the defense would try to characterize A. I. as having a similar problem obeying her mother and stepfather, they were concerned that the juror would identify with Abernathy and Lori and thus would be sympathetic to the defense position at trial.

The trial court concluded that the state had proffered race-neutral reasons for striking this juror, and we cannot say from the record that this conclusion was clearly erroneous. "Perceived inattention, nonresponsiveness, and hostility have been found to be legitimate, racially neutral reasons for striking a prospective juror." *Moak v. State*, 222 Ga. App. 36, 39 (3) (473 SE2d 576) (1996). See also *Freeman v. State*, 253 Ga. App. 401, 403 (1) (c) (559 SE2d 146) (2002). Moreover, Abernathy failed to demonstrate that this reason was mere pretext and that the state had acted with discriminatory intent. Accordingly, we find no error.

6. Abernathy further asserts that the trial court violated OCGA § 17-8-57 by making improper comments during trial. In particular he notes that the trial court stated: "I grow prouder every day of the citizens of Hall County, Georgia, as I expressed to you in orientation — well, I'm proud of everyone except one person." Abernathy contends that he was the only person in the room to whom the judge could have been referring.

But the record shows that this comment was made in the context of the trial judge's questioning the jury panel to determine if there was anyone who felt like he or she had a legal excuse not to serve on

the jury. The trial court's order in the case states that this comment was not directed at Abernathy but rather was directed in a joking manner toward Juror No. 170, who raised her hand in response to the court's question. This is supported by the trial court's next statement, which is directed toward Juror No. 170. The judge states, "I'm proud of you, too, ma'am. If you'd stand, give me your name and number." Moreover, we note that Abernathy's counsel did not object to this statement. Accordingly, we find no violation of OCGA § 17-8-57.

In addition, Abernathy asserts that the trial court spoke improperly by stating to the jury after the return of the verdict, "You tackled that task admirably and reached the correct verdict in this case." Pretermitting the issue of whether this was an improper statement, we find no error requiring reversal. "Whether that statement amounted to an improper expression of approval of the jury's verdict is immaterial since the remedy for such a remark is not a new trial, but to prohibit the offending judge from presiding over the new trial [in the event a new trial is granted]. OCGA § 17-9-22 (b)." (Citations omitted.) *Magsby v. State,* 169 Ga. App. 637, 638 (5) (314 SE2d 473) (1984).

*Judgment affirmed in part and reversed in part. Smith, P. J., and Ellington, J., concur.*

DECIDED MARCH 30, 2006 — ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Bowens, Guerra & Yeager, Cindi L. Yeager, Carl W. Bowers,* for appellant.

*Jason J. Deal, District Attorney, Lee Darragh, Jennifer C. Bagwell, Assistant District Attorneys,* for appellee.