**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 26, 2017**

# In the Court of Appeals of Georgia

A17A0963. PITTMON v. THE STATE.                    DO-032 C

DOYLE, Judge.

Following a jury trial, Eddye Pittmon was convicted of battery,[1] cruelty to children in the first degree,[2] and cruelty to children in the second degree.[3] She now appeals from the denial of her motion for new trial, contending that (1) the trial court erroneously prevented her from presenting evidence of a third party's guilt; (2) the trial court failed to sua sponte instruct the jury regarding evidence of prior difficulties; (3) she received ineffective assistance of counsel; and (4) the evidence was insufficient to support the verdict. For the reasons that follow, we affirm.

---

[1] OCGA § 16-5-23.1 (a).

[2] OCGA § 16-5-70 (b).

[3] OCGA § 16-5-70 (c).

Construed in favor of the verdict,[4] the evidence shows that in June 2014, Pittmon worked in the infant room of a daycare center. One morning, Meagan Seabolt dropped off her 18-month-old son Damon, and an early-morning staff person, Amanda Banks, took care of him before other staff arrived. While caring for Damon, Banks had occasion to change Damon's diaper, and she noticed no injuries, and he seemed "perfectly fine." When Pittmon arrived shortly after 8:00 a.m., Banks transferred Damon into Pittmon's care. Shortly after 10:00 a.m., while Banks was outside speaking with other teachers and getting a head count for lunch, Pittmon brought Damon outside to show the other teachers that she had discovered dried feces on his back that had not been properly cleaned. Banks apologized that she had not noticed it when she changed him earlier, and another worker took a photograph of Damon's body to document his condition because Pittmon was upset that his mother had brought him to the daycare dirty. At that time, neither Banks nor another employee noticed anything wrong with Damon other than his unclean condition.

Banks returned to the kitchen, which was across the hall from the infant room, where Pittmon brought Damon to bathe him. Banks heard Damon crying while he was being cleaned, but she did not find it out of the ordinary.

_____

[4] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

A few minutes later, around 10:15 or 10:30 a.m., another teacher, Montana Girard, arrived to begin her shift in the two-year-old classroom, and Pittmon called her over and asked her to look at Damon's leg. Girard noticed that Damon had just been crying and looked "scared," "worried," and "frightened." The skin on Damon's leg "pretty much looked like fresh sunburn with a little blister." Girard, who was junior to Pittmon, found it unusual that Pittmon would call her over to ask her opinion, and she advised Pittmon to call Damon's mother. When Girard told Pittmon that Damon's leg had been burned, Pittmon replied, "no, it is not, don't say that." By the end of the day, according to Girard, Damon's leg had worsened: "[It] was awful. It looked like a third[-]degree burn. It had blisters. It was just really awful."

At approximately 4:15 p.m., another mother and former Army HazMat team member arrived to retrieve her children after work. Some teachers asked her to look at Damon's leg, wondering if it could be a chemical burn. She told them that it was a water burn because it had blistered up, and she took some pictures of it. Pittmon had covered Damon's leg in lotion or ointment, and she maintained the position that it was a bite or rash.

At approximately 5:30 p.m., Banks encountered Damon again as she was getting ready for closing time. She noticed that Damon's left leg, from his knee to his

3

ankle, "was red," despite being "fine that morning." Another teacher saw Damon's leg around that time and said it "looked bad," like a burn, and took three pictures to document it. Pittmon insisted that Damon was having a reaction to a bug bite.

Around 6:00 p.m., Damon's mother, Seabolt, arrived to pick him up. Pittmon told her that she had taken him outside at 5:00 p.m., and he had been bitten by a bug, so she covered it in lotion. When Seabolt arrived home with Damon, she noticed that he was favoring his leg, and the lotion had dispersed so that she was able to see that "it was something serious." She immediately took Damon to an urgent care clinic, where she was told that it was not a bug bite but a severe liquid burn and that she should take him to the emergency room.

At the emergency room, Damon was diagnosed with second and third-degree burns to his left leg and to small portions of his abdomen, scrotum, and penis. Damon was treated for the burns and released, but he later developed a fever, so after Seabolt returned him to the emergency room, doctors sent him to an intensive burn unit, where he spent time in the intensive care unit and underwent cadaver skin surgery. Over the next 11 months, Damon was successfully treated for his burns, including a second surgery involving a graft of his own skin.

Based on these events, Pittmon was charged with two counts of aggravated battery, first degree cruelty to children for burning Damon, and second degree cruelty to children for failing to seek medical care. Following a trial, a jury returned a guilty verdict for two counts of battery (as lesser counts included in the aggravated battery counts) and both cruelty to children counts.[5] Pittmon moved for a new trial, and following an evidentiary hearing, the trial court denied the motion, giving rise to this appeal.

1. Pittmon argues that the trial court erroneously excluded evidence supporting her theory that Damon's burns occurred in the mother's care before she dropped him off at the daycare center. "We review a trial court's evidentiary ruling under an abuse of discretion standard."[6] We discern no such abuse here.

At trial, Pittmon's defense was that she never burned the child, and he must have been burned earlier in the morning while still at home with his mother. To support this theory, Pittmon elicited cross-examination testimony from the mother that Damon had pooped in his diaper that morning, and she had cleaned him just prior to dropping him off at the daycare. She apparently missed the feces on his back,

---

[5] The battery counts merged for sentencing purposes.

[6] *Freeman v. State*, 333 Ga. App. 6, 10 (2) (775 SE2d 258) (2015).

which remained after he arrived that morning. Pittmon was also able to elicit testimony that sometimes Damon was dropped off dirty, and he had head lice.

To further challenge the mother's care in parenting Damon that morning, Pittmon sought to introduce evidence that: another child, Damon's sibling, was burned on another occasion by spilled hot chocolate while in the mother's care; another sibling had exhibited bruises and burns; and the mother had a history with the Department of Family and Children Services. The trial court ruled that evidence of the mother's poor parenting of her other children was not admissible to show that the mother burned Damon in this case simply because she was a bad parent. Pittmon now argues that this ruling prevented her from confronting witnesses and present critical exculpatory evidence of another party's guilt.

As pointed out by the State, under OCGA § 24-4-404 (a): "Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion," subject to certain exceptions not applicable here.[7] Based on Pittmon's argument that the mother's prior bad parenting supports Pittmon's theory that the mother burned Damon in this case,

---

[7] See OCGA § 24-4-404 (a) (1) - (3).

6

the evidence at issue could not be used by the jury to show that the mother burned Damon without relying on the impermissible inference that the mother's bad parenting of other children made it more likely that she burned Damon in this case.[8] This is not a permissible use of evidence under OCGA § 24-4-404 (a), and the trial court did not abuse its discretion by excluding the evidence supporting such an inference.[9]

Unlike cases in which the defense was entirely precluded from introducing evidence of a third-party's guilt,[10] the trial court did allow Pittmon to make relevant challenges to the mother's parenting and conduct with respect to Damon. As noted above, Pittmon elicited testimony that Damon was occasionally dirty and had lice. Specific to the day in question, Pittmon was allowed to cross-examine the mother

---

[8] Cf. *Parks v. State*, 300 Ga. 303, 307 (2) (794 SE2d 623) (2016) (addressing Rule 404 (b) evidence).

[9] See *Klinect v. State*, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998) ("The defense is entitled to a thorough cross-examination, but the scope of cross-examination is within the sound discretion of the trial court, and under the facts of this case, there was no abuse of discretion.").

[10] Compare *Gilreath v. State*, 298 Ga. 670, 673-674 (2) (784 SE2d 388) (2016) (finding reversible error where the defendant, who was convicted of beating his two-year-old child to death, was prohibited from eliciting cross-examination testimony that the child's mother had threatened her children and once slapped the victim on her face).

7

about her careless bathing of Damon or whether she had spilled any hot liquids on Damon that morning. And Pittmon was allowed to elicit expert testimony that Damon's burns would not have resulted in blisters until hours after the burning event. All of this supported Pittmon's theory of third-party guilt; accordingly, based on the record before us, we discern no reversible error.

2. Pittmon next argues that the trial court erred by failing to sua sponte instruct the jury regarding the proper consideration of prior difficulty evidence. At trial, there was testimony from Pittmon's co-workers that Pittmon had treated Damon harshly on prior occasions by hitting him with a ruler, pen, and hairbrush; being "mean" to Damon; and restricting his play area. Pittmon contends that this evidence required an immediate instruction by the trial court, even absent a request from her counsel, that such evidence could only be considered for the proper purpose of demonstrating the relationship between the defendant and the victim.[11] Nevertheless, Pittmon's trial

---

[11] See generally *Wall v. State*, 269 Ga. 506, 509 (2) (500 SE2d 904) (1998) ("[T]he admission of [prior difficulty] evidence should be accompanied by an instruction from the trial judge explaining the limited use [i.e., to demonstrate the relationship between the victim and defendant] to which the jury may put such evidence."). See also *Porter v. State*, 243 Ga. App. 498, 501 (2) (532 SE2d 407) (2000) ("Because the relationship between the defendant and the victim is usually relevant, it is not surprising that the nature of that relationship is subject to proof at trial.").

counsel did not object on this ground nor request such an instruction or other remedy at the time this testimony was elicited, and "[i]n the absence of a [timely] request, it cannot be said that the trial court erred in failing to give contemporaneous instructions with regard to the [S]tate's evidence of prior difficulties."[12] Further, the trial court did correctly instruct the jury at the close of the evidence as to the proper use of such evidence. Accordingly, we discern no reversible error.[13]

3. Pittmon also argues that her trial counsel rendered ineffective assistance. We disagree.

Under *Strickland v. Washington*,[14] to succeed on an ineffective assistance claim, a criminal defendant must demonstrate both that his trial counsel's performance was deficient and that prejudice resulted.

> To show that the performance of [her] lawyer was deficient, [a defendant] must prove that [her] lawyer performed [his] duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. As for prejudice, the proper standard requires the defendant to show that there is a reasonable

---

[12] (Punctuation omitted.) *Dunn v. State*, 292 Ga. 359, 361 (2) (736 SE2d 392) (2013).

[13] See id.

[14] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. If the defendant fails to satisfy either prong of the Strickland test, this Court is not required to examine the other.[15]

Furthermore, "[t]here is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case."[16] In reviewing the trial court's decision, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts."[17]

(a) Pittmon first argues that her trial counsel performed deficiently by failing to request a jury instruction for the lesser-included offense of second-degree cruelty to children with respect to Count 3, which alleged first-degree cruelty to children.

---

[15] (Citations and punctuation omitted.) *State v. Harris*, 301 Ga. 234, 237 (2) (799 SE2d 801) (2017).

[16] (Citation and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004).

[17] (Punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

10

Count 3 alleged that Pittmon committed first-degree cruelty to children by burning Damon; Count 4 alleged that Pittmon committed second-degree cruelty to children by failing to seek appropriate medical attention for Damon's injuries.[18]

The relevant difference between first- and second-degree cruelty, other than sentencing, is that the former requires malice, while the latter requires criminal negligence.[19] Therefore, Pittmon asserts that her trial counsel should have requested an instruction on second-degree cruelty for the burning of Damon – arguing that she did not burn him with malice, only criminal negligence.

Nevertheless, at the hearing on Pittmon's motion for new trial, her trial counsel testified that his whole defense was predicated on showing that Pittmon did not burn Damon at all. At that hearing, he highlighted testimony from his expert witness that the burn could not have occurred at the hands of Pittmon. At trial and at the motion for new trial hearing, Pittmon's defense counsel consistently maintained the theory that "this never happened on her watch, she didn't do this."

---

[18] See OCGA § 16-5-70 (c).

[19] See OCGA § 16-5-70 (b) and (c). See also *Wells v. State*, 309 Ga. App. 661, 663-664 (2) (a) & (b) (710 SE2d 860) (2011) (addressing first- and second-degree cruelty to children offenses).

11

In light of this testimony, not requesting a charge on mere criminal negligence is consistent with a reasonable strategy of showing that the child was not burned in Pittmon's care.

Pittmon now points to an affidavit signed by her defense counsel prior to the hearing on her motion for new trial. The affidavit states that Pittmon's defense counsel did not request a lesser-included charge for Count 3 "because I thought that [Count 4] was a lesser-included charge of [Count 3]." But in his testimony, Pittmon's trial counsel explained that he was going from memory when he signed the affidavit, and he had confused those counts with Counts 1 and 2, for which the trial court did provide instructions on lesser-included counts: "[W]hen I looked at the indictment, Counts 3 and 4 weren't the counts that I thought they were referring to during our discussion. . . So it was an honest error by everybody." Accordingly, the evidentiary value of the affidavit was greatly undermined, and the trial court, as finder of fact, was entitled to disregard it as evidence of trial counsel's intentions on this issue.[20]

(b) Pittmon also argues that her trial counsel should have moved for a mistrial because the State asked one of Pittmon's character witnesses, a mother who uses the

---

[20] See *Finch v. State*, 287 Ga. App. 319, 321 (1) (b) (651 SE2d 478) (2007) ("It is the function of the trial court at the hearing on the motion for new trial to determine witness credibility and to resolve any conflicts in the testimony.").

daycare, questions about Pittmon's negative employment history without a good faith basis.

While cross-examining the character witness, the State asked the witness whether she was aware that Pittmon had been fired from a previous daycare position for improperly giving a child medication. Pittmon objected on the ground that it was false (arguing that she resigned and was not fired) and was not in evidence. The State argued that it had a good faith basis to elicit the testimony and proffered an account by a witness who would testify about Pittmon's termination from her prior daycare position. When that witness was later called, she testified that Pittmon had given a child Benadryl without the proper form being filled out by the parent, and she was terminated for that reason. During the earlier questioning, the State implied that it had happened twice, but the witness clarified that it was only once before Pittmon was terminated.

Based on this discrepancy, Pittmon moved for a mistrial but ultimately withdrew the motion. She now argues for the first time that her trial counsel performed deficiently by withdrawing the motion.

It is well settled that

13

[a] defendant must raise all allegations of ineffective assistance of counsel as soon as practicable. When new counsel appears for a defendant, he or she must raise the ineffectiveness of previous counsel at the first possible stage of post-conviction review. Where new counsel raises the issue of trial counsel's ineffectiveness on motion for new trial, any ineffective assistance of trial counsel claims not raised at that time are waived.[21]

Here, at the motion for new trial hearing, new counsel probed trial counsel's performance, but did not argue this ground. Accordingly, it is procedurally barred and cannot serve as a basis for a new trial on direct appeal.[22]

4. Last, Pittmon argues that the evidence was insufficient to support the verdict. When an appellate court reviews the sufficiency of the evidence supporting a guilty verdict,

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of

---

[21] (Footnotes and punctuation omitted.) *McGlocklin v. State*, 292 Ga. App. 162, 163 (664 SE2d 552) (2008).

[22] See *Wilson v. State*, 286 Ga. 141, 144 (4) (686 SE2d 104) (2009).

14

fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.[23]

Here, as noted above, Pittmon argued at trial that the burn occurred at home when Seabolt cleaned Damon before taking him to school. She points to testimony from a defense expert (a plastic surgeon) who testified that the blisters for the type of burn Damon received do not appear until several hours after the burning event , and she relies on other evidence (addressed in Divsion 1) that allegedly shows Seabolt's guilt. But as discussed in Division 1, the other evidence of Seabolt's character as a mother was lawfully excluded from trial, and the State adduced testimony from its own expert (a pediatric critical care physician at a burn center) that the burn Damon received would be "immediately evident with blistering." "[I]t is for the jury, not the appellate court, to resolve conflicts in testimony, weigh the evidence and draw reasonable inferences therefrom. As long as there is some competent

---

[23] (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld."[24] Based on our review of the record before us, there is sufficient evidence of Pittmon's guilt to authorize the verdict.

*Judgment affirmed. Miller, P. J., and Reese, J., concur*.

---

[24] (Citations and punctuation omitted.) *Abernathy v. State*, 278 Ga. App. 574, 579 (2) (630 SE2d 421) (2006).